## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ARTHUR A. THOMPSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. CIV-08-255-FHS |
| | ) |
| JEFFREY SMITH, individually; OFFICERS | ) |
| DOE; LEFLORE COUNTY CRIMINAL JUSTICE | ) |
| AUTHORITY, a Public Trust; BETTY | ) |
| HARRIS, individually and as | ) |
| Administrator of the LEFLORE COUNTY | ) |
| CRIMINAL JUSTICE AUTHORITY, | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

Arthur A. Thompson ("Thompson") brings this civil rights action pursuant to 42 U.S.C. § 1983 claiming he was deprived of his rights under Fourth, Eighth, and Fourteenth Amendments[1] to the United States Constitution as a result of his January 18, 2007, arrest, and subsequent four-day detention, on a material witness warrant issued in a state court murder case in Leflore County, Oklahoma, State of Oklahoma v. Randall Tyrell Steward, Case No. CF-2005-544 ("Steward case"). Defendants in this action

---

[1] In his Third Amended Complaint, Thompson also invoked the protections afforded under the Fifth Amendment. From a review of the briefing in this matter, however, the Court concludes no Fifth Amendment claim is being pursued by Thompson. When questioned at the pretrial conference about the specific constitutional provisions at issue, counsel for Thompson asserted the Fourth, Eighth, and Fourteenth Amendments as the constitutional bases for Thompson's claims. Thus, the Court will address the respective summary judgment motions against a backdrop of claims arising under the Fourth, Eighth, and Fourteenth Amendments.

are Jeffrey Smith ("Smith"), District Attorney for Leflore County, Oklahoma, the Leflore County Criminal Justice Authority ("LCCJA"), Betty Harris ("Harris"), the Administrator of the Leflore County Detention Center ("LCDC"), and Officers Doe. Smith, LCCJA, and Harris have filed separate motions for summary judgment. The LCCJA has also moved to dismiss Officers Doe. Thompson has filed a motion for partial summary judgment on the issue of liability.

## SUMMARY JUDGMENT STANDARDS

The standards relevant to the disposition of a case on summary judgment under Rule 56 of the Federal Rules of Civil Procedure are well established. Summary judgment is not appropriate if there exists a genuine material factual issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-51 (1986). "A fact is 'material' only if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" Thomas v. IBM, 48 F.3d 478, 486 (10th Cir. 1995) (quoting Anderson, 477 U.S. at 248). In this regard, the court examines the factual record and reasonable inferences therefrom in the light most favorable to the non-moving party. Deepwater Invs. Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). This court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

The moving party on summary judgment has the initial burden to show the absence of evidence to support the non-moving party's claims. <u>Celotex v. Catrett</u>, 477 U.S. 317, 325 (1986). The moving party must identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which establish the absence of any genuine issue of material fact. <u>Universal Money Centers v. AT&T</u>, 22 F.3d 1527, 1529 (10th Cir.), <u>cert. denied</u>, 115 S.Ct. 655 (1994) (quoting Fed. R. C.V. P. 56(c)). The moving party need not negate the opponents' claims or disprove its evidence, but rather, the moving party may satisfy this burden by referencing a lack of evidence on an essential element of the respective claim. <u>Celotex</u>, 477 U.S. at 325.

Should the moving party meet this initial burden, the burden thereafter shifts to the non-moving party to go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." <u>Applied Genetics v. First Affiliated Securities</u>, 912 F.2d 1238, 1241 (10th Cir. 1990). The non-moving party "may not simply rest upon its pleadings," but must come forward with specific facts "that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." <u>Adler v. Wal-Mart, Inc.</u>, 144 F.3d 664, 671 (10th Cir. 1998). To this end, the non-moving party must identify facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." <u>Id</u>.

**FACTUAL BACKGROUND**

As an eyewitness to a murder which occurred in Leflore County, Oklahoma, in December 2004, Thompson's testimony was deemed material to the state's prosecution in the <u>Steward</u> case. Apparently believing Thompson could be leaving for California for employment reasons, Leflore County Assistant District Attorney, Margaret Nicholson ("Nicholson"), filed an Application for Declaration of Material Witness in Case No. CF-05-544, on January 18, 2007, seeking to have Thompson declared a material witness. Nicholson sought the material witness designation while working on the <u>Steward</u> case with Assistant District Attorney Marion Frye ("Frye"), who prosecuted the case. Nicholson believed there was a basis for seeking the material witness designation based on conversations with Gayla Hudson ("Hudson"), a victim witness coordinator with the District Attorney's Office, who informed Nicholson and Frye that Thompson, while under subpoena, had left for California for employment reasons prior to the trial. Hudson learned that Thompson was back in the Spiro area shortly before the Application for Material Witness Declaration was filed by Nicholson.

In the Application, Nicholson requested that the Leflore County District Court require Thompson to post bail for his appearance at trial or, in lieu of such bail, issue an order of commitment directing the Sheriff of Leflore County to confine Thompson until he testified at trial. On January 18, 2007, Leflore County District Court Judge Ted Knight ("Judge Knight") issued an Order of Declaration as Material Witness declaring Thompson a material witness in the <u>Steward</u> case. Judge Knight

4

ordered that Thompson be held until he posted bail in the amount of $10,000, and that a warrant of commitment be issued directing the Sheriff of Leflore County to confine Thompson until he gave his testimony, unless such bail was posted. Judge Knight further ordered that if bail was not posted, Thompson was to be brought before a magistrate of the District Court of Leflore County without unnecessary delay. A Warrant of Arrest was also issued by Judge Knight directing law enforcement officials to arrest Thompson and take him into custody.

Around 7:00 p.m. on Thursday, January 18, 2007, Officer Theo Capes ("Capes") of the Spiro Police Department was informed by Travis Saulsberry ("Saulsberry"), an investigator with Leflore County District Attorney's Office, that an arrest warrant had been issued for Thompson as a material witness. Saulsberry asked Capes to go to Thompson's residence and take Thompson into custody. When Capes arrived at Thompson's residence he knocked on the front door and was met by an unknown individual. This individual called for Thompson to come to the door. At this point, with the front door open, Capes could smell a strong odor of marijuana coming from the residence. Thompson came to the front door and Capes informed him that he had a warrant for his arrest as a material witness. Capes took Thompson into custody and transported him to the Spiro Police Department. By phone, Capes advised Saulsberry that he had Thompson in custody and that he could smell a burning odor of marijuana coming from the residence. Saulsberry met Capes and Thompson at the Spiro Police Department and Saulsberry transported Thompson to the LCDC. Saulsberry and Thompson arrived at the LCDC at 11:55 p.m. and

Saulsberry completed the officer's intake form identifying Thompson and his status as a material witness.

After Saulsberry completed the intake form and departed from the LCDC, an unidentified LCDC guard escorted Thompson to the shower area where Thompson was asked to empty his pockets and remove his clothes. At this point, Thompson contends he was subjected to a strip search of his body before he was permitted to shower.[2] Thompson also contends that during the showering process he was subjected to viewing by others, including female officers. After the strip search, Thompson showered and he was given jail-issued clothing. Thompson was not confined in the general population of the LCDC, but rather, was placed in a holding cell by himself. Thompson remained in this first holding cell by himself until he was moved to a second cell, referenced as a juvenile cell, within the same holding area, on Saturday, January 20, 2007. In this juvenile cell, Thompson was housed with an inmate, Craig Clayton ("Clayton"), who was being held on

_____

[2] Defendants deny that Thompson was subjected to a strip search. No documentation of a strip search has been presented and there is no testimony from any Defendant, or other LCDC personnel, establishing that Thompson was indeed strip searched. Saulsberry did testify, however, that under the circumstances he "could have" mentioned the odor of marijuana coming from Thompson's residence to the LCDC booking officer – thereby establishing the necessary reasonable suspicion to conduct a strip search. Thompson's testimony is quite clear. He maintains an unidentified guard subjected him to an examination of his naked body before he was allowed to shower. Specifically, Thompson states he was told to "raise up your arms, your feet, open your mouth, stick out your tongue . . . bend over, spread your, you know . . . bend your head down." Thompson Deposition, 116:14-19. For purposes of a summary judgment analysis, the Court will weigh this evidence in the light most favorable to Thompson and find that Thompson was strip searched.

a misdemeanor charge of assault and battery.  Thompson remained in this juvenile cell for two days until he was released on Monday, January 22, 2007.  Thompson was released by Judge Knight pursuant to Thompson's Petition for Writ of Habeas Corpus and Judge Knight's finding that Thompson's incarceration for more than forty-eight hours without being taken before a judge and his incarceration with a person accused of a crime were in violation Okla.Stat.tit. 22, §§ 719 and 720.[3]  Thompson was released on his

[3]  Okla.Stat.tit 22, § 719 provides, in relevant part:

> Whenever any person shall be taken into custody by any law enforcement officer to be held as a material witness in any criminal investigation or proceeding, he shall, if not sooner released, be taken before a judge of the district court without unnecessary delay and said judge of the district court shall immediately inform him of his constitutional rights including the reason he is being held in custody, his right to the aid of counsel in every stage of the proceedings, and of his right to be released from custody upon entering into a written undertaking in the manner provided by law.  A witness who is held in custody pursuant to the provisions hereof shall be kept separately and apart from any person, or persons, being held in custody because of being accused of committing a crime.

Okla.Stat.tit. 22, § 720 provides, in relevant part:

> A.  If a law enforcement officer has probable cause to believe that a person is a necessary and material witness to a felony and that there is probable cause to believe that the person would be unwilling to accept service of a subpoena or may otherwise refuse to appear in any criminal proceeding, the officer may detain the person as a material witness with or without an arrest warrant;

own recognizance on the conditions that he remain in the Spiro area, that he check in regularly with the District Attorney's Office, and that he appear in court to testify on January 29, 2007.

Thompson did not sustain any physical injuries during his incarceration. Additionally, Thompson was not mistreated, in any way, by either the LCDC personnel or inmate Clayton during his incarceration in the LCDC. Thompson does assert that some unnamed staff member of the LCDC told him he could not bond out, that an inmate/trustee who brought him a meal told him "we know who you are, you know, the people that you're testifying against are in this jail," and that Clayton told him he knew the people Thompson was going to testify against.

Smith, who assumed his role as District Attorney on January 2, 2007, was not involved in any of the events which led up to Thompson's confinement in the LCDC, including the Application for Declaration of Material Witness, the Arrest Warrant, or the arrest and confinement of Thompson. Smith took no part in the prosecution of the <u>Steward</u> case, and the tangential material witness situation involving Thompson, because he had represented a co-defendant in that same case. Smith's client pled guilty before Smith assumed his duties as District Attorney on January 2, 2007. As testified to by Smith in his deposition, it would have been unethical for him to participate in the prosecution of

_____
                provided, no person may be detained as a
                material witness to a crime for more than
                forty-eight (48) hours without being taken
                before a judge as required by Section 719 of
                Title 22 of the Oklahoma Statutes . . . .

a case in his new role as District Attorney when he had been involved in the same case in his former role as defense counsel for a co-defendant. No one from the District Attorney's Office, including Smith, visited Thompson while he was confined. Thompson has never met Smith and would not be able to identify him.

Harris, the LCDC Jail Administrator from January 2007 until July 27, 2009, was not present when Thompson was taken to the facility and she played no role in Thompson's placement in the facility. Harris never received any complaint from Thompson while he was incarcerated about his cell placement or any other issue regarding his confinement. Harris did not instruct any LCDC officer to strip search Thompson and she has no knowledge that Thompson was strip searched. According to Harris, it would have been against LCDC policy for an officer to strip search Thompson unless that officer had reasonable suspicion that Thompson was concealing contraband, and any officer who would have conducted such a search, absent reasonable suspicion, would have been disciplined by Harris for such violation of policy. It also would have been against LCDC policy for a jail officer to view an inmate or material witness showering. LCDC policy requires that the shower door remain closed during showering. LCDC policy also forbids an officer of the opposite sex from seeing an inmate or material witness unclothed. LCDC policy requires that material witnesses "be housed separately from other inmates when necessary to protect their safety and/or security." LCDC Policy and Procedures, Exhibit 1 to Plaintiff's Response to LCCJA's Motion for Summary Judgment (Doc. No. 115). It is also against LCDC policy for any employee to inform an inmate or

material witness that he could not bond out.  Finally, Harris is not aware of any other material witness being booked into the LCDC during her tenure as Jail Administrator.

**Officers Doe**

The LCCJA has moved to dismiss Officers Doe based on Thompson's failure to serve them with process prior to the expiration of the applicable two-year statute of limitations on January 23, 2009.  Thompson does not dispute the date of limitations period, but contends that the motion should be overruled and that he be allowed to proceed against an unnamed officer[4] or, in the alternative, that the Court order the LCCJA to produce the name of the officer who conducted the strip search.  Thompson seeks additional time to serve such individual pursuant to Rule 4(m) of the Federal Rules of Civil Procedure. The Court finds dismissal without prejudice of Officers Doe to be appropriate.

Rule 4(m) provides, in part:

> If service of the summons and complaint is not made upon the defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure,

---

[4]  Thompson references this unnamed officer as the booking officer, who Thompson apparently believes to be the same officer who conducted the search strip.

> the court shall extend the time for service
> for an appropriate period.

Thompson has failed to identify and serve Officers Doe within 120 days of the filing of either the original complaint (July 9, 2008) or the third amended complaint (September 11, 2008). Taking the filing of the third amended complaint as the starting point for the running of the 120-day period, Thompson was required to identify and serve Officers Doe by January 9, 2009.

In determining whether to dismiss a defendant for failure to serve process within 120 days pursuant to Rule 4(m), the Court applies a two-step analysis. First, a mandatory extension of time must be granted if Thompson can establish good cause for failing to timely effect service. <u>Espinoza v United States</u>, 52 F.3d 838, 841 (10th Cir. 1995). Second, if good cause cannot be shown, the Court may exercise its discretion and either dismiss the defendant without prejudice or extend the time for service. <u>Id</u>.

Thompson has failed to show good cause for failing to timely effect service. From a review of Thompson's response to the motion to dismiss, it appears that Thompson's attempt to uncover the names of the officers did not begin until Thompson took the depositions of Harris and Saulsberry on August 5, 2009 - well after the running of the 120-day period on January 9, 2009. While neither Harris nor Saulsberry could identify a booking officer, Harris did identify a Kathleen Kinnison ("Kinnison") as the person preparing the classification scale during Thompson's booking. Thompson, however, never took Kinnison's deposition. Moreover, in response to an interrogatory, it appears that the

LCCJA identified, by name, those individuals who were working as jailers when Thompson was booked into jail.[5] Likewise, Thompson failed to take the depositions of any of these jailers. This neglect to undertake the most rudimentary discovery on the identity issue forecloses any finding of good cause.

Having found good cause does not exist for a mandatory extension under Rule 4(m), the Court must next consider whether a permissive extension is warranted. While the applicable two-year limitations period for section 1983 actions, see Abbitt v. Franklin, 731 F.2d 661, 662-63 (10th Cir. 1984), would undoubtedly bar any refiled action, the Court nonetheless concludes that dismissal without prejudice is appropriate in this case with respect to the Officers Doe given the dilatory efforts on the part of Thompson to identify the unnamed officers. Faced with identifying unnamed officers, Thompson waited some thirteen months from the filing of this action before deposing those individuals, Harris and Saulsberry, who he believed could identify the responsible jailers. Even at that late date, and after having previously been supplied with the names of those jailers on duty the night of his booking, Thompson chose not to depose those individuals. These less than diligent efforts should not be rewarded. Had Thompson been diligent in his efforts to uncover the identity of the officers, the Court would be inclined to be more lenient. At this point, however, to allow an extension of time to pursue discovery avenues which have been available to Thompson throughout this litigation is not justified and would, most likely, prejudice any newly identified and named

---

[5] In addition to Kinnison, the LCCJA identified Angela Danforth, Matt Underdown, Paul Edwards, and Stacy Walden as the jailers working when Thompson was booked into the LCDC.

officer or officers given the nearly three-year passage of time
from the incident in question. Consequently, Officers Doe are
dismissed without prejudice.

**Liability of Smith**

Thompson alleges Smith violated his rights under the Fourth
and Fourteenth Amendments in connection with his arrest and
detention. More specifically, Thompson claims he was wrongfully
arrested in violation of the Fourth Amendment and that his
confinement deprived him of his liberty interest without due
process of law in violation of the Fourteenth Amendment.[6] As
recited above, however, it is undisputed that Smith played no
role with respect to either Thompson's arrest or his subsequent
incarceration. Smith rightfully recused himself from the <u>Steward</u>
prosecution based on his earlier involvement as defense counsel
for a co-defendant. As a result, Assistant District Attorney
Nicholson, and not District Attorney Smith, was the individual
responsible for securing the material witness arrest warrant from
Judge Knight. Smith was not involved in this process and,

---

[6] Thompson also contends the violation of state statutes,
Okla.Stat.tit. 22, §§ 719 and 720, equates with a constitutional
violation. This argument also forms the basis for Thompson's
Motion for Partial Summary Judgment (Doc. No. 107). A violation
of state law, however, does not ordinarily constitute the basis
for a section 1983 claim. <u>Davis v. Scherer</u>, 468 U.S. 183, 194-96
(1984); <u>Rector v. City & County of Denver</u>, 348 F.3d 935, 947
(10th Cir. 2003). Thus, while the Court finds the circumstances
of Thompson's confinement do indeed implicate his liberty
interest under the Fourteenth Amendment, the Court rejects
Thompson's argument that the violation of state law, standing
alone, equates with a constitutional violation. Thompson's
Motion for Partial Summary Judgment (Doc. No. 107) must
necessarily be denied.

furthermore, took no part in the actual arrest of Thompson or his subsequent confinement. Consequently, absent any personal participation by Smith, the Court finds that Thompson's constitutional claims under the Fourth and Fourteenth Amendments against Smith, in his individual capacity, must fail as personal participation in the constitutional violation is an essential element of a section 1983 claim. <u>Coleman v. Turpen</u>, 697 F.2d 1341, 1346 n. 7 (10th Cir. 1982); <u>Twyman v. Crisp</u>, 584 F.2d 352, 355 (10th Cir. 1978); <u>Bennett v. Passic</u>, 545 F.2d 1260, 1262-63 (10th Cir. 1976).

The only involvement alleged by Thompson which even remotely suggests personal involvement by Smith is a reference to a letter sent by Smith to Thompson's attorney on January 15, 2008, stating "[w]e felt that we needed to avail ourselves of this process in order to secure his presence and testimony in the murder case State v. Steward." Exhibit 10 to Thompson's Response to Smith's Motion for Summary Judgment (Doc. #116). Thompson implies that this after-the-fact letter establishes that Smith has admitted his involvement by accepting responsibility for the material witness designation. The Court disagrees. Smith's letter was merely an official response by the District Attorney's Office to counsel's request for copies of the material witness documents generated by that office. It is not a acknowledgment by Smith that he played a role in the material witness designation process.

The tenor of Thompson's response to Smith's request for summary judgment suggests Thompson is attempting to hold Smith liable for his failure to properly supervise and oversee the

employees in his office - a failure which resulted in the alleged
constitutional violations asserted by Thompson.  To the extent
this is an attempt to impose *respondeat superior* liability on
Smith, the Court finds this theory of liability foreclosed under
section 1983.  <u>See</u> <u>Smith v. Maschner</u>, 899 F.2d 940, 950-51 (10th
Cir. 1990)(*respondeat superior* alone does not support a § 1983
claim).

Finally, any attempt by Thompson to hold Smith liable under
a theory of supervisory liability is equally unavailing.  Under
this theory, a supervisor such as Smith must be "deliberately
indifferent," rather than merely negligent.  <u>Langley v. Adams</u>
<u>County, Colo</u>, 987 F.2d 1473, 1481 (10th Cir. 1993).  Smith, as
the supervisor of Nicholson and other District Attorney's Office
employees, cannot be held liable under § 1983 on a theory of
supervisory liability unless Thompson can show that "an
'affirmative link' exists between the [constitutional]
deprivation and either the supervisor's 'personal participation,
his exercise of control or direction, or his failure to
supervise.'" <u>Meade v. Grubbs</u>, 841 F.2d 1512, 1527 (10th Cir.
1988) (quoting <u>Specht v. Jensen</u>, 832 F.2d 1516, 1524 (10th Cir.
1987)).  Thompson has merely come forward with allegations, as
opposed to evidence, to sustain a supervisory liability claim
against Smith.  There is no evidence establishing that Smith was
deliberately indifferent with respect to his supervision of
Nicholson, Frye, or any other employee regarding the material
witness designation process involving Thompson.  Smith had
properly recused himself from any involvement in the <u>Steward</u> case
and any alleged failure on his part to ensure that constitutional
standards were being upheld by his staff with respect to

Thompson's arrest and confinement as a material witness amounts to, at most, negligence, which is insufficient to establish supervisory liability.

Smith is therefore entitled to the entry of summary judgment in his favor with respect to Thompson's constitutional claims under the Fourth and Fourteenth Amendments.[7]

## Liability of Harris and the LCCJA

Thompson alleges Harris and the LCCJA violated his Fourth, Eighth, and Fourteenth Amendment rights in connection with his confinement as a material witness. Thompson alleges the strip search was performed in violation of the Fourth Amendment.[8] Thompson contends the Eighth Amendment is implicated with respect to his confinement with another inmate and the showering procedure which allowed others, including female officers, to

_____

[7] Smith does not argue this point, but even assuming some personal participation on his part, whether it be from the January 15, 2008, letter, or by virtue of a finding that as the District Attorney he was responsible for assuring that Thompson was brought before the court within forty-eight hours of his arrest and not placed in the same cell with persons accused of a crime, Smith would be entitled to a broad immunity for any actions taken by him in his prosecutorial role. See Imbler v. Pachtman, 424 U.S. 409, 427-28 (1976). This immunity extends to all activities that are "intimately associated with the judicial phase of the criminal process." Id. at 430. Thompson's allegations in connection with the material witness designation in the criminal prosecution of the Steward case clearly fall within this grant of prosecutorial immunity.

[8] The Fourth Amendment is made applicable to the states through the Fourteenth Amendment. See Mapp v. Ohio, 367 U.S. 643, 650 (1961).

view him.[9]  Finally, Thompson's Fourteenth Amendment claim is
based on an alleged deprivation of his liberty interest without
due process of law in connection with his extended confinement as
a material witness.

All of Thompson's constitutional claims against Harris
suffer from the same defect as those against Smith - lack of
personal participation.  Harris was not present when Thompson was
brought to the LCDC.  Harris took no part in the booking of
Thompson and she did not instruct any employee with respect to
any of the events occasioning Thompson's incarceration.  Harris
never received any complaint from Thompson during the course of
his incarceration concerning his cell assignment or any other
matter related to the conditions of his confinement.  In fact,
the undisputed evidence is that Harris never met Thompson nor was
she even aware of his incarceration.  Under these circumstances,
Thompson's constitutional claims under the Fourth, Eighth, and
Fourteenth Amendments against Harris, in her individual capacity,
must fail as personal participation in the constitutional
violation is an essential element of a section 1983 claim.
Coleman, 697 F.2d at, 1346 n. 7; Twyman, 584 F.2d at 355;
Bennett, 545 F.2d at 1262-63.

_____

[9]  These conditions of confinement claims have their genesis
in the Fourteenth Amendment's guarantee of substantive due
process.  See Hare v. City of Corinth, 74 F.3d 633, 639 (5th Cir.
1996)(constitutional rights of pretrial detainee flow from the
procedural and substantive due process guarantees of the
Fourteenth Amendment).  Such claims, however, are analyzed under
the Eighth Amendment's "deliberate indifference" standard, which
is made applicable to the states through the Fourteenth
Amendment.  See Barney v. Pulsipher, 143 F.3d 1299, 1310 n. 10
(10th Cir. 1998); Riddle v. Mondragon, 83 F.3d 1197, 1202 (10th
Cir. 1996).

Similarly, the record is barren of any evidence suggesting, much less establishing, deliberate indifference on the part of Harris sufficient to make a case for supervisory liability. Thompson's argument in this context is simply that Harris is responsible for the administration of the LCDC and that had she been performing her duties properly, she would have known that Thompson was incarcerated for more than forty-eight hours in violation of Oklahoma law, that he was being housed with another inmate, also in violation of Oklahoma law, and that he was being subjected to other indignities in the form a strip search and improper showering procedures.  Without more, these are merely allegations of negligent conduct on the part of Harris in performing her duties and they do not suffice to establish the requisite deliberate indifference necessary for the imposition of supervisory liability under section 1983.  No evidence has been presented to establish that Harris created any custom or policy in these areas which fostered a constitutional deprivation or that she allowed the custom or policy to continue unabated after learning about it.  In short, Thompson presents no evidence to support an affirmative link between any constitutional violation and Harris's exercise of control or direction over the LCDC. Absent such evidence, a claim for supervisory liability must fail.[10]  Meade, 841 F.2d at 1527.

Thompson seeks to impose section 1983 liability on the LCCJA as the governmental entity operating the LCDC.[11]  With respect to

_____

[10]  Because the Court has found no personal participation or supervisory liability by Harris, her alternative argument for qualified immunity need not be addressed.

[11]  Thompson has also sued Harris in her official capacity as the Administrator of the LCDC.  This official capacity claim against Harris is redundant as it is simply another means of

18

the LCCJA, Thompson seeks to impose liability based on a theory of inadequate training and the implementation of a policy that violates Oklahoma law by allowing material witnesses to be housed with other inmates and by failing to provide that material witnesses be brought before a judge within forty-eight hours of being taken into custody. The LCCA contends summary judgment is appropriate because first, Thompson has failed to show he was subjected to any constitutional violation and, second, he has wholly failed to present any evidence showing that the constitutional violations allegedly visited upon him were the result of an official policy or custom of the LCCJA. The LCCJA asserts that based on the record before the court, Thompson is limited to attempting to hold it liable for the alleged tortious actions of its employees – a theory of liability which has consistently been rejected in section 1983 actions.

The Court need only address this second argument. A municipality[12] cannot be held liable in a section 1983 action for the acts or omissions of its employees or agents on the basis of <u>respondeat superior</u>. <u>Monell v. New York City Dept. of Social</u>

_____

bringing suit against an entity which is already a party to this suit – the LCCJA. <u>See</u> <u>Kentucky v. Graham</u>, 473 U.S. 159, 165-66 (1985) (official capacity suits are simply another way of suing the municipality or the governing body itself).

[12] The LCCJA is the proper governing-body defendant in this action. The LCCJA was formed as a public trust to operate the LCDC, with Leflore County as the beneficiary. The LCCJA is an entity which performs a public function, the operation of the LCDC, and it is invested with powers associated with those exercised by governmental entities, such as the right of eminent domain. 60 O.S. § 176(I). The LCCJA approves the policies and procedures for the operation of the LCDC. Thus, the municipal or governmental liability analysis for section 1983 liability is applicable to the LCCJA.

_Services_, 436 U.S. 658, 694-95 (1978).   "It is only when the 'execution of the government's policy or custom . . . inflicts the injury' that the municipality may be held liable under §1983."  _Springfield v. Kibbe_, 480 U.S. 257, 267 (1987) (O'Connor, J., dissenting) (quoting _Monell_, _supra_, at 694).  The municipality itself must cause the constitutional violation in the sense that "[a]t the very least there must be an affirmative link between the policy and the particular constitutional violation alleged." _Oklahoma City v. Tuttle_, 471 U.S. 808, 823 (1984).  As reiterated by the Supreme Court, a municipality is only liable when the official policy is the "'moving force' behind the injury alleged." _Board of County Commissioners v. Brown_, 520 U.S. 397, 404 (1997).  Moreover, when the municipal policy itself does not violate federal law and it is, in fact, lawful on its face, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." _Id_.

    Municipal liability arising from a failure to train must result from the municipality's "deliberate indifference" to its inhabitants, i.e. it must "reflect[] a 'deliberate' or 'conscious' choice by a municipality." _City of Canton v. Harris_, 489 U.S. 378, 389 (1989)  This "deliberate indifference" standard requires the municipality to have "actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." _Barney_, 143 F.3d at 1307 (citing _Brown_, 520 U.S. at 407).  Typically, this notice requirement can be satisfied by the existence of a pattern of tortious conduct. _Brown_, 520 U.S. at 407-08.  "In a 'narrow

20

range of circumstances,' however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations."  Barney, 143 F.3d at 1307-08 (citing Brown, 520 U.S. at 409; Canton, 489 U.S. at 390 & n.10).

Thompson's attempt to hold the LCCJA accountable under section 1983 for the alleged constitutional violations falls short as he has wholly failed to show that any custom or policy of the LCCJA was the moving force behind the alleged injuries. First, with respect to Thompson's placement in a cell with Clayton, the record establishes the LCCJA policy to be that material witnesses, such as Thompson, should be housed separately from other inmates when necessary to protect the material witnesses' safety, or for security reasons.  This policy, which promotes, but does not necessarily mandate, the separate housing of material witnesses from those charged with crimes, cannot be said to be the moving force behind Thompson's injuries as no constitutionally recognizable injury is present in this context given the undisputed record establishing that Thompson was not harmed, in any fashion, by being housed with Clayton.[13]  Second, with respect to the alleged strip search, it is clear that the

_____

[13]   The Court recognizes that this policy does not mirror Okla.Stat.tit. 22, § 719's mandatory requirement of separate housing from any person being held because of being accused of a crime.  Again, however, any violation of the requirement imposed under state law is not sufficient to establish a section 1983 claim.  Davis, 468 U.S. at 194-96.

LCCJA policy prohibited any strip search of Thompson absent
reasonable suspicion to suspect he might be concealing
contraband.[14]     Either the unnamed officer had reasonable
suspicion to strip search Thompson based on his knowledge of the
marijuana odor being present when Thompson was arrested, or the
strip search was conducted by this unnamed officer in
contravention of the LCCJA policy requiring reasonable suspicion
for a strip search. Under either scenario, no municipal
liability can attach as no custom or policy of the LCCJA can be
said to have caused the constitutional injury resulting from the
strip search. Third, with respect to the shower procedure, the
undisputed evidence is that the LCCJA policy requires the shower
door to remain closed during showering and, furthermore, that

---

[14]    With regard to strip searches, Fourth Amendment analysis
"requires a balancing of the need for the particular search
against the invasion of personal rights that the search entails."
Bell v. Wolfish, 441 U.S. 520, 559 (1979).   "Courts must consider
the scope of the particular intrusion, the manner in which it is
conducted, the justification for initiating it, and the place in
which it is conducted."  Id.   The Tenth Circuit has "articulated
two primary concerns in determining whether a strip search is
reasonable for the purposes of the Fourth Amendment: whether a
detainee is to be placed in the general prison population and
whether there is reasonable suspicion that the detainee has
concealed weapons, drugs, or contraband."  Archuleta v. Wagner,
523 F.3d 1278, 1284 (10th Cir. 2008)(citing Warner v. Grand
County, 57 F.3d 962, 964 (10th Cir. 1995); Hill v. Bogans, 735
F.2d 391, 394 (10th Cir. 1984)).   Thompson, as a material witness
was never going to be placed in the general population of the
LCDC; consequently, the relevant inquiry is whether there was
reasonable suspicion to believe Thompson had weapons, drugs, or
contraband given the circumstances under which he was taken into
custody.  The Court need not resolve this issue, however, as the
resolution in favor of LCCJA is not dependent on a finding of no
underlying constitutional violations, but rather, on the basis
that, even assuming such a violation exists, there is no
affirmative link, or causal connection, between the LCCJA custom
or policy and the constitutional violation alleged.

officers of the opposite sex are prohibited from seeing an inmate or material witness unclothed.  To the extent it could be proven by Thompson that he was viewed by others, including female officers, during the course of the showering procedure, such viewing is not attributable to a custom or policy of the LCCJA, but rather, to the actions of unnamed LCDC officials, acting in violation of clear LCCJA policy.  Thus, no custom or policy of the LCDC can be said to be the moving force in this context. Finally, as to the delay in bringing Thompson before a judge,[15] no LCCJA custom or policy exists concerning this issue. Undoubtedly, the absence of a custom or policy in this area is due to the undisputed fact that no other individuals had been held as material witnesses during Harris's tenure as Jail Administrator.[16]    Thus, even assuming the jail facility, as opposed to the prosecutor or the Leflore County District Court, was responsible for assuring that material witnesses be brought before the court without unnecessary delay, it cannot be said that any custom or policy of the LCCJA caused Thompson's extended delay in being presented to a judge.[17]

---

[15]    According to Thompson's calculations, he was held for eighty-four hours before he appeared before Judge Knight.

[16]    Saulsberry, the former Jail Administrator, also testified that he did not recall any material witnesses being held at the LCDC.

[17]    Where the responsibility ultimately rests for assuring that a material witness be brought before a court without unnecessary delay is not clear from a reading of the state statutes, Okla.Stat.tit. 22, §§ 719 and 720.  It seems logical to this Court, however, that the ultimate responsibility would rest with the individual and entity that sought the material witness designation and warrant in the first place - Nicholson (and Frye) and the District Attorney's Office.

**Conclusion**

Although the confluence of events herein is such that it is not an unreasonable assessment to conclude, as Thompson has, that "someone should be held responsible" because his "rights and dignities have been harmed" as a result of the "perfect storm" of his incarceration. In order to redress perceived wrongs, however, it is necessary to assert viable theories of recovery against those individuals responsible for the harm. As the foregoing analysis explains, Thompson has failed in this respect and the constitutional claims asserted by Thompson against these defendants under section 1983 must fail. Consequently, the Motions for Summary Judgment filed by Smith (Doc. No. 103), Harris (Doc. No. 106), and the LCCJA (Doc. No. 108) are granted. Thompson's Motion for Partial Summary Judgment (Doc. No. 107) is denied. The LCCJA's Motion to Dismiss Officers Doe (Doc. No. 142) is granted and Officers Doe are dismissed without prejudice. This action is therefore dismissed in all respects.

It is so ordered this 11th day of December, 2009.


Frank H. Seay
United States District Judge
Eastern District of Oklahoma